**Ouida Sue PARKER, Plaintiff–Appellant,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, Schering–Plough Corporation, and Schering–Plough Health Care Products, Inc., Defendants–Appellees.**

No. 95–5269.

United States Court of Appeals, Sixth Circuit.

Argued April 9, 1996.

Decided Oct. 25, 1996.

Roger K. Rutledge (briefed), Kaye G. Burson (argued and briefed), Memphis, TN, for Ouida Sue Parker.

Joseph Trovato (briefed), New York City, John J. Heflin, Rickey, Bourland, Heflin & Alvarez, Memphis, TN, Alan E. Lazarescu, Allan M. Marcus (argued and briefed), New York City, for Metropolitan Life Insurance Co.

Frederick J. Lewis (argued and briefed), Rhonda M. Taylor (briefed), McKnight, Hudson, Lewis & Henderson, Memphis, TN, for Schering–Plough Corporation, Schering–Plough Health Care Products, Inc.

Caroline G. LaCheen (briefed), New York Lawyers for the Public Interest, New York City, for AIDS Action Council, American Foundation for AIDS Research, American Public Health Association, National Alliance for the Mentally Ill, National Association of Protection and Advocacy Systems, National Minority AIDS Council, Amici Curiae.

Ann E. Reesman (briefed), McGuiness & Williams, Washington, DC, Gail S. Coleman (briefed), Mary L. Clark (argued), Office of the General Counsel, Washington, DC, for Equal Employment Advisory Council, Amicus Curiae.

Before: MERRITT and MILBURN, Circuit Judges; and O'MALLEY, District Judge.*

* The Honorable Kathleen M. O'Malley, United States District Judge for the Northern District of Ohio, sitting by designation.

MERRITT, Circuit Judge.

Plaintiff filed this action against her employer, Schering–Plough, and her employer's insurance company, Metropolitan Life, under the Americans with Disabilities Act ("Disabilities Act" or "the Act"), 42 U.S.C. §§ 12101–12213, and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461. After working for Schering for nine years, the Plaintiff became totally disabled due to "severe depression." Under the long term disability plan offered through her employer, she was given benefits for twenty-four months. Because her disability was deemed to be caused by a "nervous/mental" disorder, her benefits were then cut off. Had her disability been due to physical problems, she would have continued to receive benefits until the age of 65.

The District Court found that the Plaintiff did not have standing to sue under Title I of the Disabilities Act because she is not a "qualified individual with a disability," due to the fact that she can no longer perform the essential functions of her job. The District Court also held that the Plaintiff does not have standing to sue under Title III of the Disabilities Act because she was not denied physical access to goods or services. And finally, the District Court granted Defendants' motion for summary judgment on Plaintiff's ERISA claim because it found that Defendants' classification of Plaintiff's disorder as "nervous/mental," rather than physical, was not arbitrary and capricious. We AFFIRM the decisions of the District Court with respect to Plaintiff's ERISA and Title I claims.

The decision of the District Court with respect to Plaintiff's Title III claim, however, must be REVERSED. The statutory language of the Disabilities Act is sufficiently broad to prohibit discrimination in the contents of insurance products, not just physical access to insurance company offices. In addition, the legislative history of the Act, agency interpretation, and interpreting case law all support the conclusion that the Disabilities Act prohibits discrimination in the

contents of insurance products. Thus, the Plaintiff has standing to bring her Title III claim. Plaintiff must still prove, however, that the specific differentiation engaged in here, where those with nervous/mental disorders are treated differently from those with physical disorders in the provision of long term disability benefits, is, as a substantive matter, discriminatory under the Disabilities Act. We therefore REMAND this case for further proceedings consistent with this opinion.

## I.  Facts and Procedural History

Ouida Sue Parker worked for Schering–Plough from 1981 until 1990. During that time, she chose to participate in Schering's Long Term Disability plan, which was administered through Metropolitan Life Insurance Company. According to her complaint, on October 29, 1990, she became totally disabled due to "chronic severe major depression of a physical origin."

Ms. Parker began receiving benefits on April 29, 1993, after the twenty-six week waiting period expired. Under the MetLife Disability Plan, persons who are deemed to be totally disabled due to a mental or nervous disorder can receive benefits for up to twenty-four months. (Persons "fully disabled" under the plan are those who, because of sickness or injury, cannot do their job.) At the end of the twenty-four months, benefits continue only if the person is confined to a hospital or qualified institution. In contrast, persons considered totally disabled due to physical disorders receive benefits until the age of sixty-five.

During the period in which Ms. Parker was receiving disability benefits, her doctor sent MetLife reports indicating that she remained totally disabled primarily due to "major depression" and secondarily due to "generalized anxiety disorder." MetLife wrote to her on April 15, 1993, indicating that benefits would terminate on the 29th of that month. Ms. Parker appealed the decision, arguing that her disability could not be considered completely mental and nervous. MetLife denied the appeal, stating that major depression falls under the mental/nervous disorder provision. In May, 1993, Ms. Parker's doctor again wrote to MetLife, stating that the ma-

jor depression she suffered was "a chemical disorder of a deepseated nature." MetLife had one of its consulting psychiatrists review the file. He concluded that:

> Irrespective of any chemical factors in its etiology, major depression is a DSM III R diagnosis; Ms. Parker is being treated by a psychiatrist with psychoactive medication. In my opinion, her major depression should be reimbursed under the nervous/mental illness clause of her contract.

MetLife again upheld the termination of her benefits.

Ms. Parker then filed this action, alleging violations of Titles I and III of the Americans with Disabilities Act and a violation of the Employee Retirement Income Security Act. The District Court granted Defendants' motions for summary judgment. First, it found that Ms. Parker did not have standing to sue under Title I of the Disabilities Act, because the statute provides relief only to "qualified individuals with a disability" and, at the time her benefits were terminated, Ms. Parker was not a "qualified individual with a disability" because her disorder prevented her from "performing the essential functions of her job." The District Court also dismissed Ms. Parker's claim against MetLife under Title III of the Disabilities Act because it found that the statute does not cover discrimination in insurance policies; it covers only physical access to goods and services. The District Court dismissed Plaintiff's Title III claim against Schering for the additional reason that the Disabilities Act explicitly states that Title I governs employment practices, not Title III. Finally, the District Court granted summary judgment in favor of the Defendants on Plaintiff's ERISA claim. It held that the appropriate standard of review of a plan administrator or fiduciary's interpretation of an insurance plan provision is the "arbitrary and capricious" standard, and, in this case, Plaintiff failed to raise sufficient evidence that the classification of her disorder as "nervous/mental" was arbitrary and capricious.

## II.  ERISA Claim

The District Court granted Defendants' motion for summary judgment on Plaintiff's ERISA claim. Plaintiff claims that the MetLife/Schering decision to classify Ms. Par-

ker's disability as "nervous/mental" should be reviewed *de novo*. Plaintiff then argues that under such a standard, summary judgment is inappropriate because there is a genuine issue of material fact regarding the cause of Plaintiff's disability. As the District Court noted, however, the Supreme Court has held that "a denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). In this case, the plan contains a detailed and explicit provision granting Defendants the authority to do just that.

█ In 1991, in *Miller v. Metropolitan Life Insurance Co.*, this Court held that where such discretion exists, an ERISA benefit plan administrator's decisions on eligibility for benefits are not arbitrary and capricious if they are "rational in light of the plan's provisions." 925 F.2d 979, 984 (6th Cir.1991) (citing *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir.), *cert. denied*, 488 U.S. 826, 109 S.Ct. 76, 102 L.Ed.2d 52 (1988)). The decision to terminate Ms. Parker's benefits based on the categorization of her disability as "nervous/mental" clearly meets that standard. Ms. Parker's doctor told MetLife that she was suffering primarily from "major depression" and secondarily from a "generalized anxiety disorder." Ms. Parker then wrote to MetLife, stating that her disability could not be considered "completely" mental and nervous. While it is true that Ms. Parker's doctor then wrote to MetLife, stating that the major depression she suffered was "a chemical disorder of a deepseated nature," MetLife's consulting psychiatrist reviewed the file and concluded that:

> Irrespective of any chemical factors in its etiology, major depression is a DSM III R diagnosis; Ms. Parker is being treated by a psychiatrist with psychoactive medication. In my opinion, her major depression should be reimbursed under the nervous/mental illness clause of her contract.

Thus, MetLife's decision to classify Plaintiff's illness as mental appears rational, not arbitrary. If the standard of review were *de novo*, perhaps there would be a genuine issue of material fact as to whether chemical imbalances which lead to depression are "physical" or "mental" disorders. The standard of review being what it is, there is no genuine issue. The District Court properly granted summary judgment on Plaintiff's ERISA claims.

█ Plaintiff argues, alternatively, that because Defendants stand to gain financially from their present interpretation of the plan, this conflict of interest mandates a higher standard of review. The case law does not support this contention. Even while acknowledging that conflicts must be taken into account, courts have upheld the arbitrary and capricious standard. *Firestone*, 489 U.S. at 115, 109 S.Ct. at 956–57; *Jung v. FMC Corp.*, 755 F.2d 708 (9th Cir.1985). In *Firestone*, the Supreme Court also stated that, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conduct must be weighed as a 'factor in determining whether there is an abuse of discretion.'" 489 U.S. at 115, 109 S.Ct. at 957 (citing Restatement (Second) of Trusts § 187 cmt. d (1959)). In *Jung*, the Ninth Circuit held that, "[w]here, as here, the employer's denial of benefits to a class avoids a very substantial outlay, the reviewing court should consider that fact in applying the arbitrary and capricious standard of review. Less deference should be given to the trustee's decision." 755 F.2d at 712. Thus, even if this Court found a conflict, it would merely be a factor to be taken into account. The standard of review would be the same: arbitrary and capricious. And even assuming, for the sake of argument, that such a conflict exists, Defendants' decision would still not be arbitrary or capricious.

### III. Title I Claim

The District Court held that Ms. Parker did not have "standing" to sue under Title I of the Disabilities Act (the title that governs employment practices) because she is not a "qualified individual with a disability." Section 12112(a) of the Americans with Disabilities Act provides that "[n]o covered entity shall discriminate against a *qualified individual with a disability* because of the disability of such individual in regard to …

terms, conditions, and privileges of employment" (emphasis added). Disability is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual...." 42 U.S.C. § 12102(2)(A). A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

■ Under the District Court's interpretation of the plain meaning of that statute, Ms. Parker was at no time a "qualified individual with a disability." At the time she could "perform the essential functions" of her job, she was not disabled for purposes of her long term disability claim, and therefore was not covered by the Disabilities Act, and at the time her insurance benefits were terminated, she could no longer perform her job.

In *Beauford v. Father Flanagan's Boys' Home,* a Rehabilitation Act case, the Eighth Circuit held that employees who are no longer able to do their job are not "otherwise qualified handicapped individuals" covered by the Act. 831 F.2d 768, 771 (8th Cir.1987), *cert. denied,* 485 U.S. 938, 108 S.Ct. 1116, 99 L.Ed.2d 277 (1988). The court concluded that, "[d]iscrimination in the handling of salary continuation and health and dental benefits due handicapped employees unable to perform the essential functions of their jobs is an undesirable thing. However, in the end, protection from such discrimination is simply not contemplated under Section 504 of the Rehabilitation Act." *Id.* at 773. The Disabilities Act provides that "agencies with enforcement authority ... under this subchapter and under the Rehabilitation Act of 1973 shall develop procedures to ensure that administrative complaints filed under [these Acts] are dealt with in a manner that avoids duplication of effort and prevents imposition of inconsistent or conflicting standards for the same requirements...." 42 U.S.C. § 12117(b) ("Coordination"). Thus, the District Court held in this case that Rehabilitation Act cases interpreting the definition of "qualified" should govern in the Disabilities Act context as well. The court also cited the legislative history of the Disabilities Act as support for its conclusion. The legislative history, according to the court below, indicates that the main purpose of Title I was to ensure that disabled persons could obtain and keep employment, and therefore, it was not intended to provide relief for Ms. Parker.

The Equal Employment Opportunity Commission in its amicus brief asserts that *Beauford* was wrongly decided and should therefore not be followed. Plaintiff and the EEOC also provide an alternate interpretation of the statutory language under which Plaintiff is a "qualified individual with a disability." The EEOC explains in its brief that the Disabilities Act explicitly prohibits discrimination in fringe benefits, citing 42 U.S.C. § 12112(b)(2). It argues that because "most long-term disability benefits are reserved for those who are unable to hold any substantial employment for which they are qualified," under the court's interpretation of the term qualified, "virtually no employee could ever challenge discrimination in the provision of long-term disability benefits." EEOC Br. 11 (citing Fred K. Foulkes, *Employee Benefits Handbook* 18–2 (1982)). The EEOC concludes that "[t]he fact that this approach would bar most employees from challenging discrimination in the provision of long-term disability benefits strongly suggests that it is incorrect," because the Disabilities Act's express prohibition against discrimination in fringe benefits would be significantly undermined. The circularity of this reasoning is apparent.

The EEOC states at page twelve of its brief that, "To be covered under Title I of the statute, an employee need only be able to 'perform the essential functions of the employment position that such individual holds or desires.'" (quoting 42 U.S.C. § 12111(8)). It then suggests that Ms. Parker is not seeking to invoke the statute to allow her to obtain or retain what one would ordinarily think of as an "employment position." Both sides agree that she cannot continue to work at all. Thus, the Plaintiff and EEOC suggest that she is invoking the statute in an effort to retain the "employment position" of "benefit recipient." The term does not appear anywhere in the statute itself. The concept of an employment position entitled "benefits re-

cipient" appears to be creative thinking on the part of Plaintiff and the EEOC. They argue that the Plaintiff is qualified to hold this position because she has satisfied all the non-discriminatory eligibility criteria by working for Schering, becoming a participant in the LTD plan, and paying her premiums as required.

Plaintiff's proposed construction of the statute is not persuasive. The concept of "benefits recipient" as an "employment position" relies on a convoluted construction of the statutory language, which conflicts with the plain meaning of the words. Perhaps the drafters of the statute intended that Ms. Parker's situation bring her within the coverage of the Disabilities Act. If that is the case, they failed to provide definitions that lend themselves to doing so. Unfortunately, Congress may not have taken this situation into account. Such an oversight, however, is for Congress to remedy. We should not try to rewrite the statute in a way that conflicts with what appears to be fairly clear language.

Plaintiff and amici are unable to cite any case law to support their construction of the statute explicitly, although they do cite two cases in which totally disabled persons were permitted to sue their employers under the Disabilities Act. *Carparts Distribution Ctr., Inc. v. Automotive Wholesaler's Ass'n of New England, Inc.,* 37 F.3d 12 (1st Cir.1994) (AIDS patient had standing to sue under Disabilities Act where insurance benefits for AIDS related illnesses were more limited than benefits for other illnesses); *Schroeder v. Connecticut Gen. Life Ins. Co.,* No. 93–M–2433 (D.Colo. April 22, 1994) (Plaintiff stated a claim under Disabilities Act where LTD benefits were terminated after 30 months on grounds that disability was "mental"). The issue of standing was not raised, however, in either of these two cases. In contrast, the United States Court of Appeals for the Eleventh Circuit, in *Gonzales v. Garner Food*

*Services, Inc.,* rejected the line of reasoning suggested by the Plaintiff in this case. The *Gonzales* court held that a former Garner employee who was a participant in Garner's health benefit plan by virtue of his former employment was not a "qualified individual with a disability" within the meaning of the Disabilities Act. 89 F.3d 1523 (11th Cir.1996); *see also McNemar v. The Disney Store, Inc.,* 91 F.3d 610 (3d Cir.1996); *Kennedy v. Applause, Inc.,* 90 F.3d 1477 (9th Cir.1996); *Equal Employment Opportunity Comm'n v. CNA Ins. Cos.,* 1996 WL 26879 (N.D.Ill. Jan. 23, 1996); *Esfahani v. Medical College of Penn.,* 919 F.Supp. 832 (E.D.Pa.1996).

### IV. Title III and IV Claims

■ Unlike Title I of the Disabilities Act, which governs employment practices, Title III governs "Public Accommodations and Services Operated by Private Entities." The issue presented by this case is whether it violates Title III of the Disabilities Act for an employer and its insurer to provide inferior health care benefits for employees with mental illness as compared to the benefits given to employees with physical illness. A threshold question exists, however, as to whether the Disabilities Act prohibits discrimination in the contents of the goods and services offered at places of public accommodation, rather than just discrimination in terms of physical access to places of public accommodation. We find that the Disabilities Act does reach the contents of goods and services,[1] and must therefore address the subsequent issue of whether insurance products are exempted from the effects of Title III by the "safe harbor" provisions of Title IV.

### A. The Meaning of the "Public Accommodation" Provision

■ Title III of the Disabilities Act provides that, as a "General Rule":

No individual shall be discriminated against on the basis of disability in the full

---

1. Part of the confusion that exists in this case stems from Congress' use of the term "public accommodation." This term harks back to the public accommodations language in the Civil Rights Act of 1964 and other early civil rights legislation, statutes designed to afford all persons with physical access to private establishments. Conceptually, the idea of access to places of public accommodation is very different from the idea of discrimination in the content of goods and services. Yet, rather than clearly stating its intention to write a broader reaching statute, the drafters have simply grafted "goods and services" language onto "public accommodation" terminology.

and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). Section 12182 also includes more detailed prohibitions, such as those against the provision of unequal or separate benefits:

> (b) Construction
>> (1) General prohibition
>>> (A) Activities
>>>> (ii) Participation in unequal benefit
>>>> It shall be discriminatory to afford an individual ... on the basis of a disability ... with the opportunity to participate in or benefit from a good ... that is not equal to that afforded to other individuals.
>>>> (iii) Separate benefit
>>>> It shall be discriminatory to provide an individual ... on the basis of a disability ... with a good ... that is different or separate from that provided to other individuals, unless such action is necessary to provide the individual or class of individuals with a good, service, facility, privilege, advantage, or accommodation, or other opportunity that is as effective as that provided to others.

42 U.S.C. §§ 12182(b)(1)(A)(ii)–(iii). Plaintiff argues that the plain language of these provisions covers "insurance products," because insurance products are "goods" or "services" provided by a "person" who owns a "public accommodation." We agree.

Statutory language must be given its common and ordinary meaning. *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 590–91, 7 L.Ed.2d 492 (1962). Bearing in mind this important principle, we find that Title III of the Disabilities Act prohibits discrimination on the basis of disability in the contents of insurance products. Insurance products clearly fall within the common and ordinary meaning of the term "goods," and the provision of insurance coverage clearly falls within the common and ordinary meaning of the term "service." In addition, the statute specifically includes "insurance office"

within the definition "public accommodation" if the entity's operations affect commerce. 42 U.S.C. § 12181(7)(F). The Plaintiff's condition qualifies as a "disability," which is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). Furthermore, because she suffers from a "nervous/mental" (rather than a physical) disability, the Plaintiff is receiving a "good" or "service" that is "different ... from that provided to other individuals." Thus, the Plaintiff appears to meet the statutory criteria for establishing a claim under Title III of the Disabilities Act.[2]

In addition to ascribing to words their common and ordinary meaning, we also note that we are bound to interpret statutory language in such a way as to avoid rendering terms superfluous. *Burns v. United States*, 501 U.S. 129, 145, 111 S.Ct. 2182, 2191, 115 L.Ed.2d 123 (1991). Defendants' suggested statutory interpretation would do just that. To say that the Disabilities Act prohibits discrimination only as to "physical access" to places of "public accommodation" would write the terms "goods" and "services" out of the statute. In addition, we note that, even if the language were not so clear, remedial statutes are to be interpreted broadly, in a manner consistent with their stated goal. *Gomez v. Toledo*, 446 U.S. 635, 639, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). The Disabilities Act was intended to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The meaning we ascribe to the provisions today is much more in keeping with this broad goal than the constricted interpretation suggested by Defendants.

Numerous cases have interpreted the statute as we do today. For example, in *Carparts Distribution Ctr., Inc. v. Automotive Wholesaler's Ass'n of New England, Inc.* (a case the District Court in this case declined

---

**2.** Although the "safe harbor" provisions of Title IV (which we address later in this opinion) serve to limit ADA liability significantly in the insurance context, the safe harbor provisions do not entirely nullify the broad reach of the Title III prohibitions against discrimination and their apparent applicability to insurance products.

to follow without discussion), the First Circuit held that "public accommodation" within the meaning of Title III of the Disabilities Act is not limited to actual physical structures, and thus, the act may apply to a limitation of lifetime health benefits for AIDS related illnesses. 37 F.3d 12 (1st Cir. 1994). The *Carparts* court relied primarily, as we do, on the plain language of the statute and concluded that to "limit the application of Title III to physical structures which persons must enter to obtain goods and services would run afoul of the purposes of the [Disabilities Act] and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges and advantages, available indiscriminately to other members of the general public." *Id.* at 20.

Similarly, District Courts in the Third, Ninth and Eleventh Circuits have concurred with this reasoning. In *Sharrow v. Bailey,* the United States District Court for the Middle District of Pennsylvania held that an HIV-positive patient whose surgery was delayed by one day when his doctor requested protective suits, even though they were not necessary under Center for Disease Control standards, had standing to sue under Title III of the Disabilities Act. 910 F.Supp. 187 (M.D.Pa.1995). The District Court held that in order to establish a violation of § 12182(a), "a plaintiff must prove that he or she: 1) has a disability; 2) was discriminated against on the basis of that disability; 3) was thereby denied goods or services; 4) by a place of public accommodation by the owner or operator of that facility." *Id.* at 191. In *Kotev v. First Colony Life Insurance Co.,* the United States District Court for the Central District of California held that a woman who was denied life insurance based on her spouse's HIV-positive status could bring an action under Title III of the Disabilities Act. 927 F.Supp. 1316 (C.D.Cal.1996). That court concluded that "Congress intended to reach insurance practices by prohibiting differential treatment of individuals with disabilities in insurance offered by public accommodations unless the differences are justified." *Id.* at 1322–23. And finally, in *Baker v.*

*Hartford Life Insurance Co.,* the United States District Court for the Northern District of Illinois held that an insurance company may be held liable under Title III of the Disabilities Act based on a denial of coverage. 1995 WL 573430 (N.D.Ill. Sept. 28, 1995).[3]

In this case, the District Court chose to follow another District Court of this Circuit, which had held that a woman who sued her employer and her insurer when she was turned down for family health insurance because of her husband's hypertension and because her son was a paraplegic had no standing, due to the fact that the Disabilities Act prohibits discrimination in terms of physical access to places of public accommodation, not to the goods and services sold there. *Pappas v. Bethesda Hosp. Ass'n,* 861 F.Supp. 616 (S.D.Ohio 1994). In *Pappas,* the District Court reasoned that the plain language of Title III requires a "nexus" between the "public accommodation" and the alleged discrimination, which was not present in the case. *Id.* at 620. Thus, the court concluded that "the scope of Title III is limited to discrimination in the provisions of goods, services ... or accommodations based on a disabled person's physical ability to make use of those goods, services, etc." *Id.* We disagree with this narrow interpretation of the Disabilities Act's provisions. We agree, instead, with the First Circuit's view that:

> Many goods and services are sold over the telephone or by mail with customers never physically entering the premises of a commercial entity to purchase the goods or services. To exclude this broad category of businesses from the reach of Title III and limit the application of Title III to physical structures which persons must enter to obtain goods and services would run afoul of the purposes of the [Disabilities Act] and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges and advantages, available indis-

---

**3.** According to the EEOC, there is a pending case, *Leonard F. v. Israel Discount Bank,* No. 95–6420 (2d Cir.), which involves the applicability of the ADA to discrimination in the provision of long-term disability benefits, but the order is unpublished and is not available through the electronic database services. It has been appealed, but the Second Circuit has not yet ruled.

criminately to other members of the general public.

*Carparts,* 37 F.3d at 20.[4]

### B. The Application of the "Safe Harbor" Provision to Insurance

█ Defendants next argue that the so-called "safe-harbor" provision of Title IV of the Disabilities Act was designed to protect the insurance industry from being substantively regulated by the other provisions of the Act. Section 12201(c) of the Disabilities Act, captioned "Insurance," states that, "[s]ubchapters I through III of this chapter and title IV of this Act shall not be construed to prohibit or restrict (1) an insurer ... or entity that administers benefit plans ... from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law...." The section also explains, however, that the above paragraph "shall not be used as a subterfuge to evade the purposes of subchapter I and III of this chapter." Under Defendants' reasoning, even if Title III could reasonably be construed to regulate the contents of insurance products, the "safe-harbor" provision excludes insurance products from any effect the Act might otherwise have. As long as their policies are consistent with state law, they assert, the Disabilities Act is totally inapplicable.

Unlike the language of Title III, which is quite clear, the meaning of the "safe harbor" provision is not self-evident. In fact, the statute appears to be purposefully vague in order to satisfy contending interest groups. Unable to decide on exactly what it intended

to legislate, Congress inserted language which looks in two directions. One provision attempts to appease the insurance industry; the other provisions attempt to help the large group of disabled people. In doing so, Congress has again left this Court in a position to give meaning to conflicting statutory language designed as a political compromise.

We find that, in this instance, the statute is totally ambiguous on its face. The Supreme Court has long held that, in such an instance, we may turn to the legislative history of the provision for guidance. *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547–48, 79 L.Ed.2d 891 (1984). Here, both the House and Senate reports make it clear that the safe harbor provision does not serve to insulate the insurance industry completely from the Disabilities Act in its provision of insurance coverage. One House Report explains that:

> Under the [Disabilities Act], a person with a disability cannot be denied insurance or be subject to different terms or conditions of insurance based on disability alone, if the disability does not impose increased risks.
>
> . . . .
>
> Moreover, while a plan which limits certain kinds of coverage based on classification of risk would be allowed under this section [codified at 42 U.S.C. § 12201(c) ], the plan may not refuse to insure, or refuse to continue to insure, or limit the amount, extent, or kind of coverage available to an individual, or charge a different rate for the same coverage solely because

4. Defendants also assert the ADA requires that its standards be "consistent" with those of the Rehabilitation Act. 42 U.S.C. § 12117(b) ("Coordination"). They then point to Rehabilitation Act cases that, they assert, hold that the type of differentiation engaged in in this case is not illegal. They cite two Supreme Court cases, both of which are inapposite. *Alexander v. Choate,* 469 U.S. 287, 304, 105 S.Ct. 712, 721–22, 83 L.Ed.2d 661 (1985) (facially neutral limits on coverage, e.g. limit on number of inpatient hospital days which applies to all persons, regardless of disability, not a violation of the Rehabilitation Act); *Traynor v. Turnage,* 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988) (permissible to deny Rehabilitation Act benefits to veterans if their disability is the result of their own willful misconduct). Although the legislative history of the

ADA affirms *Alexander*'s holding that, "employee benefit plans should not be found to be in violation of this legislation under impact analysis simply because they do not address the special needs of every person with a disability, e.g., additional sick leave or medical coverage," that situation is not presented by this case. S.Rep. No. 116, 101st Cong., 1st Sess. 85 (1989). In addition, Defendants fail to recognize that despite its provision requiring "consistent" standards, the ADA was enacted because "current laws [e.g. the Rehabilitation Act] were 'inadequate' to combat 'the pervasive problems of discrimination that people with disabilities are facing.'" *Helen L. v. DiDario,* 46 F.3d 325, 331 (3d Cir.) (quoting S.Rep. No. 116, 101st Cong., 1st Sess. 18 (1989)), *cert. denied,* —— U.S. ——, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995).

of a physical or mental impairment, except where the refusal, limitation, or rate differential is based on sound actuarial principles or is related to actual or reasonably anticipated experience.

For example, a blind person may not be denied coverage based on blindness independent of actuarial risk classification.

H.R.REP. No. 485, 101st Cong., 2nd Sess., pt. II, at 136–37 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 303, 419–20. The explanation continues:

In sum, section 501(c) [the safe-harbor provision] is intended to afford to insurers and employers the same opportunities they would enjoy in the absence of the legislation to design and administer insurance products and benefit plans in a manner that is consistent with basic principles of insurance risk classification. This legislation assures that decisions concerning the insurance of persons with disabilities which are not based on bona fide risk classification be made in conformity with non-discrimination requirements. Without such clarification, this legislation could arguably find violative of its provisions any action taken by an insurer or employer which treats disabled persons differently under an insurance or benefit plan because they represent an increased hazard of death or illness.

The provisions recognize that benefit plans (whether insured or not) need to be able to continue business practices in the way they underwrite, classify, and administer risks, so long as they carry out those functions in accordance with accepted principles of insurance risk classification.

*Id.* at 137–38, reprinted in 1990 U.S.C.C.A.N. at 420–21. Another House report states:

[Section 12201] specifies that titles I, II, and III shall not be construed to restrict various insurance practices on the part of insurance companies and employers, as long as such practices are not used to evade the purposes of this Act.

. . . .

Specifically, [Section 12201(c)(1) ] makes it clear that insurers may continue to sell to and underwrite individuals applying for life, health, or other insurance on an indi-

vidually underwritten basis, or to service such products, so long as the standards used are based on sound actuarial data and not on speculation.

. . . .

In sum, [the Disabilities Act] requires that underwriting and classification of risks be based on sound actuarial principles or be related to actual or reasonably anticipated experience.

H.R.REP. No. 485, 101st Cong., 2nd Sess, pt. III, at 70 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 493. The Senate report contains an explanation nearly identical to those quoted above. *See* S.REP. No. 116, 101st Cong., 1st Sess. 84–86 (1989). In addition, the Senate Report states:

The Committee does not intend that any provisions of this legislation should affect the way the insurance industry does business in accordance with the State laws and regulations under which it is regulated. Virtually all States prohibit unfair discrimination among persons of the same class and equal expectation of life. The [Disabilities Act] adopts this prohibition of discrimination. Under the [Disabilities Act], a person with a disability cannot be denied insurance or be subject to different terms or conditions of insurance based on disability alone, if the disability does not pose increased risks.

*Id.* at 84. Thus, when the extensive and explicit legislative history is taken into account, it becomes reasonably clear that insurance practices are protected by the "safe-harbor" provision, but only to the extent that they are consistent with "sound actuarial principles," "actual reasonably anticipated experience," and "bona fide risk classification."

Defendants also assert that an insurance plan cannot violate the Disabilities Act unless it qualifies as a "subterfuge" under § 12201(c). They argue that the "subterfuge" provision applies only to attempts to avoid the Disabilities Act by means of a "scheme, plan, stratagem or artifice of evasion," citing to the recent case of *Modderno v. King*, 82 F.3d 1059 (D.C.Cir.1996). In *Modderno*, a Rehabilitation Act case, the

D.C. Circuit concluded that a coverage limitation placing a $75,000 maximum lifetime limit on mental health benefits fell within the safe-harbor provision of the Disabilities Act, which has been incorporated by statute into the Rehabilitation Act. The *Modderno* court reasoned that such a coverage limitation would only violate the Rehabilitation Act if it ran afoul of the "subterfuge" provision of § 12201(c). The *Modderno* court noted that the Supreme Court held in two different cases that "subterfuge" language contained in the Age Discrimination in Employment Act ("ADEA") could not apply to plans adopted before the enactment of the ADEA. *Public Employees Retirement Sys. v. Betts,* 492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989); *United Air Lines, Inc. v. McMann,* 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977). In those cases, the Supreme Court reasoned that the common meaning of the word "subterfuge" includes "scheme, plan, stratagem or artifice of evasion," and that it would be impossible to spell out an intent to "evade" a statute that had not yet been passed. *Betts,* 492 U.S. at 168, 109 S.Ct. at 2861–62. Thus, the *Modderno* court concluded, coverage limitations enacted before the passage of the Disabilities Act do not fall into the subterfuge exception to the Disabilities Act's safe harbor provision. *Modderno,* 82 F.3d at 1065.

■ Defendants' reliance on *Modderno* is misplaced. Although the *Modderno* court acknowledged that Congress amended the ADEA to include the plan upheld in *McMann* and then removed the "subterfuge" language in response to *Betts,* the court concluded that Congress was "on full alert as to what the Court understood the word [subterfuge] to mean" and decided to include the term in the Disabilities Act anyway. The *Modderno* court ignored explicit language in the legislative history that was clearly meant to resolve this longstanding conflict. Both the Senate and House Reports indicate that the safe-harbor section may not be used as subterfuge to evade the purposes of the Act "regardless of the date an insurance plan or employer benefit plan was adopted." H.R.REP. No. 485(III), *supra,* at 71, reprinted in 1990 U.S.C.C.A.N. 494; S.REP. No. 116, *supra,* at 85. Thus, the subterfuge language

would apply to the coverage limitation imposed on the Plaintiff in this case if it qualifies as an attempt evade the purposes of the Act, regardless of when it was first instituted. And even if a practice did not qualify as "evasive" under the subterfuge provision, it might still be violative of the Act if it was based on speculation, and not on sound actuarial principles, actual or reasonably anticipated experience, or bona fide risk classification.

Defendants' reliance on the First Circuit's remark in *Carparts* that "there is some indication in the legislative history that the [insurance] industry received this exemption not because its policies would otherwise be substantively regulated under Title III, but because 'there is some uncertainty over the possible interpretations of the language contained in Titles I, II, and III as it applies to insurance ....'" is not persuasive. *Carparts,* 37 F.3d at 20 (quoting S.REP. No. 116, 101st Cong., 1st Sess. 84 (1989)). The fact that Congress acknowledged in its own report the obvious ambiguity in the Disabilities Act's statutory language only provides support for our resort to legislative history for clarification. That legislative history weighs in favor of our decision to remand this case for further findings.

Furthermore, as noted above, we are bound to interpret remedial statutes broadly. *Gomez v. Toledo,* 446 U.S. 635, 639, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). The Disabilities Act was intended to place the disabled on an equal footing with others. Congress was seeking to bring the disabled into the mainstream of American life. To construe the safe harbor provision with the breadth suggested by the Defendants would leave the disabled open to arbitrary discrimination in an area which is vital to that participation. Medical care in the event of illness is a serious concern to every member of society, disabled or non-disabled. It seems unlikely that Congress would leave the insurance industry virtually untouched by a statute that is designed to address "the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b)(4) ("Purpose"). There could hardly be a "good" or "service" more central

to the day-to-day life of a seriously disabled person than insurance—for it is often insurance coverage that will determine a disabled person's ability to prevent the disability from limiting his or her participation in society.

In addition, although agency interpretations of statutes are not generally binding on this Court, the Supreme Court has said in the past that where "Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute ... the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). In this instance, the agencies responsible for implementing the Disabilities Act have all found that the contents of insurance products, as a general matter, are covered by the Act. The agencies use the same terminology as the legislative history when describing the types of coverage distinctions which are and are not permissible under the Act. For example, the Department of Justice Technical Assistance Manual states:

> *Insurance.* Insurance offices are places of public accommodation and, as such, may not discriminate on the basis of disability in the sale of insurance contracts or in the terms or conditions of the insurance contracts they offer. Because of the nature of the insurance business, however, consideration of disability in the sale of insurance contracts does not always constitute "discrimination." An insurer or other public accommodation may underwrite, classify or administer risks that are based on or not inconsistent with State law, provided such practices are not used to evade the purposes of the [Disabilities Act].

Thus, a public accommodation may offer a plan that limits certain kinds of coverage based on classification of risk, but may not refuse to insure, or refuse to continue to insure, or limit the amount, extent, or kind of coverage available to an individual, or charge a different rate for the same coverage solely because of a physical of mental impairment, except where the refusal, limitation, or rate differential is based on

sound actuarial principles or is related to actual or reasonably anticipated experience.

Dep't of Justice, *Americans with Disabilities Act Technical Assistance Manual,* § III–3.11000.

As the District Court noted in *Hartford,* "the mere fact that an insurer decides to deny insurance coverage because of plaintiff's disability does not necessarily preclude a claim under the Disabilities Act. It is possible that the decision to deny plaintiff coverage was not based on considerations of underwriting or classifying risks, in which case plaintiff might be entitled to recover under the Disabilities Act." 1995 WL 573430 at *3. Thus, on remand, the Plaintiff will have to show that the distinction between mental and physical disabilities in long-term disability coverage is not justified by "sound actuarial principles" or "actual or reasonably anticipated experience" or "bona fide risk classification."

Defendants argue that their distinction between mental and physical disability is justified. They point to the legislative history of Title I, which states:

> [E]mployers may not deny health insurance coverage completely to an individual based on the person's diagnosis or disability. For example, while it is permissible for an employer to offer insurance policies that limit coverage for certain procedures or treatments, e.g., only a specified amount per year for mental health coverage, a person who has a mental health condition may not be denied coverage for other conditions such as for a broken leg or for heart surgery because of the existence of the mental health condition.

S.Rep. No. 116, *supra* at 29. Defendants also cite the EEOC's own regulations, which state that, "Typically, a lower level of benefits is provided for the treatment of mental/nervous conditions than is provided for the treatment of physical conditions.... Such broad distinctions ... are not distinctions based on disability." EEAC Brief at 18 (citing EEOC Compliance Manual). Plaintiff responds that long-term disability, unlike health insurance, is a "wage replacement" benefit, not medical coverage. Thus, the Plaintiff concludes, the

differentiation between mental and physical ailments may be justified in the health insurance context, but there is no similar basis for the distinction in the long-term disability realm because of the nature of the coverage. Alternatively, Defendants argue, the Disabilities Act does not protect against differentiation between different groups of disabled persons, only against discrimination against the disabled versus the non-disabled. Schering points out that "Title III is not intended to govern any terms or conditions of employment by providers of public accommodations or potential places of employment; employment practices are governed by title I of this legislation." S.REP. No. 116, *supra,* at 58. Thus, based on our affirmance of Plaintiff's Title I claim, it is not clear whether Schering remains a proper defendant to the remaining claim in this suit. These issues are now ripe for litigation in the court below.

We note, however, that it is not the role of the courts to write insurance policies. Title IV clearly places a significant amount of discretion in the hands of insurance companies to write policies that are "consistent with state law." Just as the Supreme Court held that the administrator of an ERISA plan who has been given discretion to interpret the plan may do so in any way that is rational in light of the plan's provisions, Congress clearly intended similar deference to the insurance industry in this area. Thus, as noted above, insurance practices, including the insurance industry's justification for its distinction between mental and physical disabilities, are therefore protected to the extent they are in accord with sound actuarial principles, reasonably anticipated experience and bona fide risk classification. *See Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989).

The District Court's dismissal of Plaintiff's Title III Disabilities Act claim is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.