Doukas v. MetLife                         CV-94-478-SD  12/19/96


UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE


Susan K. Doukas


        v.                                    Civil No. 94-478-SD


Metropolitan Life
  Insurance Company


O R D E R


This civil action raises the novel question of whether and
to what extent the Americans with Disabilities Act of 1990 (ADA),
42 U.S.C. §§ 12101-12213 (Supp. 1994), would apply to an
insurance agency's decision to deny coverage to an individual
otherwise covered by the Act.  Plaintiff Susan K. Doukas brought
this action as a result of Metropolitan Life Insurance Company's
(MetLife) denial of her application for mortgage disability
insurance.  The court has previously granted defendant's motion
to dismiss the Fair Housing Act claim, 42 U.S.C. §§ 3601-3631
(1977 & Supp. 1994), but denied defendant's motion to dismiss two
counts brought under the ADA in which defendant argued that the
claims were barred by the statute of limitations.  See Order of
February 21, 1995.

Presently before the court is defendant's motion for summary judgment on plaintiff's remaining ADA claims, to which plaintiff has interposed an objection.  Also before the court is a cross-motion for summary judgment, to which defendant objects.  In addition, the court has reviewed the reply memoranda filed by both parties in support of their respective motions.

Background

In July of 1991, plaintiff Susan K. Doukas applied for mortgage disability insurance with MetLife in connection with a condominium she planned to buy.  MetLife denied her application in a letter dated July 29, 1991, citing Doukas's medical history.  In further correspondence, MetLife clarified that its decision was based on Doukas's assertion in her application that she had been diagnosed with a mental illness known as bipolar disorder and that she had been taking lithium for eight years.

After purchasing the condominium, Doukas reapplied for mortgage disability insurance from MetLife in August of 1992.  MetLife denied this second application in a letter dated September 14, 1992.  MetLife stated in later correspondence that Doukas's second application was denied because Doukas's medical history did not meet its underwriting standards governing disability coverage.

## Discussion

### 1.  Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  Rule 56(c), Fed. R. Civ. P.; Lehman v. Prudential Ins. Co. of Am., 74 F.3d 323, 327 (1st Cir. 1996). Since the purpose of summary judgment is issue finding, not issue determination, the court's function at this stage "'is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  Stone & Michaud Ins., Inc. v. Bank Five for Savings, 785 F. Supp. 1065, 1068 (D.N.H. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

In determining whether summary judgment is appropriate, the court construes the evidence and draws all justifiable inferences in the non-moving party's favor.  Anderson, supra, 477 U.S. at 255.

When the non-moving party bears the burden of persuasion at trial, to avoid summary judgment he must make a "showing sufficient to establish the existence of [the] element[s] essential to [his] case."  Celotex Corp. v. Catrett,, 477 U.S. 317, 322-23 (1986).  It is not sufficient to "'rest upon mere allegation[s] or denials of his pleading.'"  LeBlanc v. Great Am.

3

Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson, supra, 477 U.S. at 256), cert. denied, ___ U.S. ___, 114 S. Ct. 1398 (1994). Rather, to establish a trial-worthy issue, there must be enough competent evidence "to enable a finding favorable to the non-moving party." Id. at 842 (citations omitted). Similarly, when the moving party bears the burden of proof at trial, he must initially produce enough evidence to support his position. See In re Varrasso, 37 F.3d 760, 763 (1st Cir. 1994).

Summary judgment shall be entered only when no genuine issue of fact exists and the movant has demonstrated he is entitled to judgment as a matter of law. The existence of undisputed facts is a necessary precondition to entry of summary judgment, but will not suffice in and of itself. See id. at 764. The movant must also show he is "entitled to judgment as a matter of law." Id. (citing Rule 56(c), Fed. R. Civ. P.). This is so because "[u]ndisputed facts do not always point unerringly to a single, inevitable conclusion. And when facts, though undisputed, are capable of supporting conflicting yet plausible inferences-- inferences that are capable of leading a rational factfinder to different outcomes in a litigated matter depending on which of them the factfinder draws--then the choice between those inferences is not for the court on summary judgment." Id.

4

## 2. Plaintiff's Title III Claim

Plaintiff has brought her claim pursuant to Title III of the ADA, entitled "Public Accommodations and Services Operated by Private Entities," 42 U.S.C. §§ 12181-12189.[1] The determination of whether either party is entitled to summary judgment on Count I of the complaint,[2] which alleges a Title III violation, requires a two-part analysis. First, the court must decide whether Title III was intended to extend to the substance of an insurance company's insurance practices, and then, if so, the court must decide whether or not Metropolitan Life is protected by a safe-harbor provision applicable to insurance companies, contained within Title V, "Miscellaneous Provisions", of the ADA.

Title III of the ADA prohibits, inter alia, discrimination against individuals on the basis of disability in the full and equal enjoyment of goods or services of any place of public accommodation by a person who owns or operates such a place. 42 U.S.C. § 12182(a). The prohibition extends to "the denial, on

---

The ADA is broken down into several subchapters. Title III, "Public Accommodations", should not be confused with Title I of the ADA, which deals with employment-related matters.

The complaint also alleges that defendant violated the section of Title V called "Miscellaneous Provisions", 42 U.S.C. §§ 12201-12210. The court finds that a plaintiff cannot sue directly under said section, however, as nothing therein indicates that Congress intended a private right of action. Accordingly, the court grants defendant's motion for summary judgment as to Count II.

5

the basis of disability, of the opportunity to benefit from the goods, [or] services . . . of an entity." Carparts Distrib. Ctr. v. Automotive Wholesaler's Ass'n of New England, Inc., 37 F.3d 12, 18 (1st Cir. 1994); 42 U.S.C. § 12182(b); 28 C.F.R. § 36.202.

### a. Application of Title III to Insurance Policies

A private insurance office is considered a "public accommodation" under Title III provided that its operations affect commerce. See 42 U.S.C. § 12181(7)(F). Under the plain language of Title III, an insurance office is a "public accommodation" that is prohibited from discriminating on the basis of disability in the provision of a good or service, which includes insurance products.

Defendants first contend that Title III was not intended to regulate the sale of insurance, but rather solely to prohibit places of public accommodation from denying equal physical access to persons on the basis of their disabilities. The question of physical access, however, does not warrant prolonged attention, given that the First Circuit has recently held that in light of the plain meaning of ADA wording, agency regulations, and public policy concerns, "public accommodation" is not limited to actual physical structures. See Carparts, supra, 37 F.3d at 19 (observing that Congress clearly intended that the ADA protect

6

not only those persons who enter facilities to purchase services, but also those who buy the same services over the telephone or by mail).

The more subtle question raised by MetLife is whether Title III was intended only to protect <u>access</u> to services, or whether Congress meant, in addition, "to shape and control which products and services may be offered." <u>See</u> <u>id.</u>[3] That is, could the prohibitions of Title III extend to the actual contents of an insurance policy?  Nothing in the legislative history precludes extending the statute to the substance of the good or service. <u>Id.</u>  <u>Carparts</u> discusses the question, but ultimately declines to offer conclusive guidance, in favor of remanding to the district court so that further facts could be gathered.[4]

This court agrees with plaintiff that under the plain language of Title III, the Act would extend to the substance or

---

By analogy, while the ADA would likely require a company that makes and distributes tools to provide easy access to its retail outlets, it is unclear whether the Act could mandate that the company make minor adjustments in the design of the tools to make them usable by persons with limited disabilities.  <u>Id.</u> at 20.

In <u>Carparts</u>, plaintiff and his company claimed that a health benefits plan offered by defendants and their administering trust discriminated against them by amending the plan to include a lifetime cap on AIDS-related health benefits.  As the issue involved whether the ADA extended to discrimination in the provision of insurance, the question is virtually identical to that presented in this case.

7

contents of an insurance policy where, as here, the plaintiff has been denied access to insurance because of his or her disability. Metropolitan Life is a public accommodation, and its insurance policies are a "good" or "service" under Title III. Furthermore, the type of discrimination alleged here, the denial of access to the product (insurance) is of the type that the statute was intended to address. Specifically, Title III generally prohibits an entity from denying an individual, on the basis of disability, the opportunity to participate in or benefit from the entity's goods or services. See 42 U.S.C. § 12182(b)(1)(A)(i). Furthermore, the same section of Title III also provides that the following type of activity is generally prohibited:

> It shall be discriminatory to provide an individual . . . on the basis of a disability with a good, service, facility, privilege, advantage, or accommodation that is different from that provided to other individuals, unless such action is necessary to provide the individual with a good, service, facility, privilege, advantage, or accommodation, or other opportunity that is as effective as that provided to others.

42 U.S.C. § 12182(b)(1)(A)(iii). The language, "with a good [or] service . . . different . . . from that provided to other individuals" logically extends not only to access to the good, but to the nature of the good itself. Thus, the type of discrimination alleged by Doukas could fit under either definition: (1) she was denied the opportunity to benefit from

8

MetLife's insurance products, <u>see</u> 42 U.S.C. § 12182(b)(1)(A)(i), or (2) by denying Doukas's application for insurance, MetLife provided her with a good or service different from that provided to others, <u>see</u> 42 U.S.C. § 12182(b)(1)(A)(iii).

The court has also been guided by the following "specific prohibitions" of Title III:

> (i) **the imposition . . . of eligibility criteria** that screen out or tend to screen out an individual with a disability . . . from fully and equally enjoying any goods, services, [etc.] unless such criteria can be shown to be necessary for the provision of [such] goods, services, [etc.];
> (ii) **a failure to make reasonable modifications in policies, practices, or procedures**, when such modifications are necessary to afford such goods, services, [etc.] to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, [etc.];
> (iii) **a failure to take such steps as may be necessary** to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, [etc.] being offered would result in an undue burden . . . .

42 U.S.C. § 12182(b)(2)(A)(i)-(iii) (emphasis added). The broad wording and diversity of these "specific prohibitions," are a strong indication that Title III was intended to extend beyond mere access or availability of a good or service. The conclusion

that the ADA may extend to the substance of a public accommodation's practices or policies such as an insurance company's insurance policies is also consistent with the following excerpt from a House Report discussing §§ 12182(b)(2)(A)(i)-(iii):

> As explained above, it is a violation of this title to exclude persons with disabilities. . . . It . . . would be a violation for such an establishment to invade such individuals' privacy by trying to identify unnecessarily the existence of a disability--for example, for purposes of a credit application, by a department store inquiring whether an individual has epilepsy, has ever . . . been hospitalized for mental illness, or has any other disability.
> . . . .
> In addition, this subsection prohibits the imposition of criteria that "tend to" screen out an individual with a disability. This concept, drawn from current regulations under Section 504 (See, e.g. 45 C.F.R. 84.13), makes it discriminatory to impose policies or criteria that, while not creating a direct bar to individuals with disabilities, diminish such individuals' chances of participation.
> Such diminution of opportunity to participate can take a number of different forms.

H.R. Rep. 485(II), 101st Cong., 2d Sess. 105, *reprinted in* 1990 U.S.C.C.A.N. 267, 388.

Finally, the court notes that several recent decisions from other jurisdictions have interpreted the plain language of Title III to extend to the substance of an insurance policy. <u>See, e.g., Parker v. Metropolitan Life Ins. Co.</u>, 99 F.3d 181, ___,

10

1996 WL 613142, at *7 (6th Cir. Oct. 25, 1996) (holding that Title III's prohibition on discrimination could extend to an insurance company's practice of differentiating between nervous/ mental disorders and physical disorders in the provision of long-term disability benefits); <u>Kotev v. First Colony Life Ins. Co.</u>, 927 F. Supp. 1316, 1320-23 (C.D. Cal. 1996) (plaintiff denied life insurance because he was married to a woman infected with HIV); <u>Baker v. Hartford Life Ins. Co.</u>, 1995 WL 573430 (N.D. Ill. Sept. 28, 1995) (insurance company's denial of application for major medical insurance).

Accordingly, this court's reading of the plain and ordinary meaning of Title III leads to the conclusion that the statute extends to an insurance company's denial of insurance. This conclusion is also consistent with the purpose of the statute, as articulated in <u>Carparts</u>. As observed in that case,

> The purpose of the ADA is to "invoke the sweep of Congressional authority . . . in order to address the major areas of discrimination faced day-to-day by people and disabilities," 42 U.S.C. § 12101(b). The ADA was enacted to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The purpose of Title III of the ADA, is "to bring individuals with disabilities into the economic and social mainstream of American life . . . in a clear, balanced, and reasonable manner." H.R. Rep. No. 485, 101st Cong., 2d Sess., pt. 2, at 99 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 382. In drafting Title III, Congress intended that

> people with disabilities have equal access to the
> array of goods and services offered by private
> establishments and made available to those who do
> not have disabilities.  S. Rep. No. 116, 101st
> Cong., 1st Sess. at 58 (1989).

Carparts, supra, 37 F.3d at 19.

In light of the broad scope of Title III, Congress certainly intended to include the insurance industry within its reach.

> There can hardly be a "good" or "service" more
> central to the day-to-day life of a seriously
> disabled person than insurance--for it is often
> insurance coverage that will determine a disabled
> person's ability to prevent the disability from
> limiting his or her participation in society.

Parker, supra, 99 F.3d at ---, 1996 WL 613142, at *12.

Extending the ADA to an insurance company's decision to deny insurance is also consistent with the interpretation of the ADA set forth by the Department of Justice (DOJ), which published an Appendix to the regulations setting forth a section-by-section analysis of Title III and a response to comments.  28 C.F.R. pt. 36, app. B.  Such administrative interpretations of an Act by the enforcing agency, "'while not controlling on the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'"  Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 672 (1st Cir. 1995) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)).

12

The DOJ interprets Title III as prohibiting "differential treatment of individuals with disabilities <u>in insurance offered by public accommodations</u> unless the differences are justified." 28 C.F.R., pt. 36, app. B., § 36.212 (emphasis added). In addition, the DOJ has found that "[a]lthough life and health insurance are the areas where the regulation will have its greatest application, the Act applies equally to unjustified discrimination in all types of insurance provided by public accommodations." <u>Id.</u>

## B. The ADA's Safe-Harbor Provision

The ADA provides a safe-harbor section that is applicable to insurance companies:

> **(c) Insurance**
> Subchapters I through III of this chapter and title IV of this Act shall not be construed to prohibit or restrict--
> (1) an insurer, hospital or medical service company, health maintenance organization, or any agent, or entity that administers benefit plans, or similar organizations from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law;
> . . . .
> Paragraph[] (1) . . . shall not be used as a subterfuge to evade the purposes of subchapter[s] I and III of this chapter.

42 U.S.C. § 12201(c).

Defendant argues in its motion that it can take refuge in

13

the safe-harbor provision because its decision to deny Doukas coverage was based on internal underwriting guidelines that are not inconsistent with state law and because its policies were based on actual or reasonably anticipated experience suggesting that persons with bipolar disorder have an increased risk of loss.  Plaintiff contends that the ADA would require that the insurance company rely on actuarial data.

The language "not inconsistent with state law" within section 12201(c) is ambiguous, and it is therefore appropriate to turn to the legislative history of this section for guidance in interpreting it.  See Parker, supra, 99 F.3d at ___, 1996 WL 613142 at *10.  As the legislative history is extensive, and has been quoted at length elsewhere, see id., the court will only recite here some excerpts from a report issued by the Senate Committee on Labor and Human Resources.

> [T]he main purposes of this legislation include prohibiting discrimination in employment, public services, and places of public accommodation.  The Committee does not intend that any provisions of this legislation should affect the way the insurance industry does business in accordance with the State laws and regulations under which it is regulated.
> Virtually all States prohibit unfair discrimination among persons of the same class and equal expectation of life.  The ADA adopts this prohibition of discrimination.  Under the ADA, a person with a disability cannot be denied insurance or be subject to different terms or conditions of insurance based on disability alone, if the disability does not pose increased risks.

14

. . . .

> Moreover, while a plan which limits certain kinds of coverage based on classification of risk would be allowed under this section, <u>the plan may not refuse to insure</u>, or refuse to continue to insure, or limit the amount, extent, or kind of coverage available to an individual, or charge a different rate for the same coverage solely because of a physical or mental impairment, <u>except where the refusal, limitation, or rate differential is based on sound actuarial principles or is related to actual or reasonably anticipated experience.</u>
>
> . . . .
>
> In sum, [the safe-harbor provision] is intended to afford to insurers and employers the same opportunities they would enjoy in the absence of this legislation to design and administer insurance produces and benefit plans in a manner that is consistent with basic principles of insurance risk classification. With such a clarification, this legislation could arguably find violative of its provisions any action taken by an insurer or employer which treats disabled persons differently under an insurance or benefit plan because they represent an increased hazard of death or illness.

S. Rep. No. 116, 101st Cong., 1st Sess. (1989) (emphasis added).

<u>See also</u> H.R. Rep. No. 485(II), 101st Cong., 2d Sess. 135-48, *reprinted in* 1990 U.S.C.C.A.N. 303, 418-21.

As these sections make clear, the ADA would not require that an insurance company base its insurance decisions on actuarial principles; instead, the ADA also permits such decisions to be related to actual or reasonably anticipated experience.

From this court's review of New Hampshire law, it appears that an insurance company's failure to rely on actuarial

15

principles or actual or reasonably anticipated experience may be inconsistent with New Hampshire law.  Under the New Hampshire law governing Unfair Trade Practices, "unfair discrimination" is defined as:

> Making or permitting any unfair discrimination between individuals of the same class and of essentially the same hazard in the amount of premium, policy fees, or rates charged for any policy or contract of health insurance or in the benefits payable thereunder, or in any of the terms or conditions of such contract, or in any other manner whatsoever.

New Hampshire Revised Statutes Annotated (RSA) 417:4, VIII(b) (1991).  Accordingly, if an insurance company differentiates between members of the same class for an "unfair" reason, and not because they represent an increased risk of loss, the company may well be acting in a manner "inconsistent" with New Hampshire law.

Plaintiff argues that defendant's decision must be grounded in sound actuarial[5] principles before it can be protected by the safe-harbor provision.  However, the court finds that neither state law nor the ADA has such a requirement.  Instead, the insurance practice must either be based on actuarial data or on the company's actual or reasonably anticipated experience

---

"Actuarial" is defined as "relating to statistical calculation."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 22 (3d ed. 1969).

16

relating to the risk involved.[6]

Having ascertained the relevant legal principles, the court will now turn to whether a genuine issue of fact exists as to whether MetLife's denial of Doukas's application was inconsistent with state law and whether either party is entitled to judgment as a matter of law.

Since February of 1990, MetLife's underwriting guidelines have required that it decline coverage to those applicants who have experienced a single occurrence of bipolar disorder symptoms within five years of the date of application or more than one occurrence in their lifetime. See Affidavit of Robert Nappi ¶ 5 (Exhibit 1 to MetLife's motion).

MetLife declined Doukas's application because a letter from her physician submitted with her application indicated that he had treated her for the disorder for twenty years and that her treatment consists of medication, monitoring, and psychotherapy.

---

The court pauses to note that the issue of burden of proof has only been tangentially addressed by the parties. The safe-harbor provision does not clearly set forth who bears the burden of showing the that insurance practice is based on or not inconsistent with state law, nor does it state who bears the burden of showing that the insurance practice was a subterfuge to evade the purposes of the Act. As will be shown below, genuine issues of material fact exist on both issues and neither party is entitled to judgment as a matter of law; thus, it is unnecessary for these issues to be resolved at this juncture. Should the issue arise at trial, nothing herein precludes the parties from briefing the issue at that time.

From this letter, MetLife surmised that Doukas had experienced more than one occurrence of bipolar disorder symptoms in her lifetime and thus did not meet MetLife's underwriting standards. See Affidavit of Beverly Slowley ¶ 6 (Exhibit 2 to MetLife's motion).

In essence, MetLife contends that its coverage policy is based on both past and reasonably anticipated experience that has shown that "persons afflicted with bipolar disorder are either already disabled or are more likely to become disabled and, consequently, create an unacceptable risk of loss from an underwriting standpoint." Defendant's Memorandum in Support of Summary Judgment Motion at 13. In support of this position, defendant attaches an affidavit of an underwriter from its company, who states that MetLife's experience as an insurance carrier has demonstrated increased morbidity among those applicants suffering from bipolar disorder, as well as a trend of longer disabilities for those diagnoses as compared to other impairment groups. See Nappi Affidavit ¶ 4.

Plaintiff argues that MetLife's reliance on its underwriting guidelines was deficient because they are not related to "reasonably anticipated experience." Viewing the evidence in the light most favorable to plaintiff, MetLife may have denied her application because of the long period of time that she had

18

received treatment for bipolar disorder, and not because she had had more than one occurrence in her lifetime. Affidavit of Beverley Slowley ¶ 5. According to plaintiff, MetLife's practice of denying applications simply because a person has been treated for bipolar disorder is not based on reasonable criteria. Instead, MetLife should have taken into account certain "prognostic indicators" that can be used to distinguish high-risk patients from low-risk patients. See Affidavit of Gary S. Sachs, M.D. ¶ 14; Affidavit of Frederick K. Goodwin, M.D. ¶ 28. Such indicators show that higher risk patients are those who had not received treatment, have not complied with a treatment regimen, or have abused alcohol or other substances. See Sachs Affidavit ¶ 14; Goodwin Affidavit ¶ 28. Doukas has also submitted evidence that when these criteria are considered, her risk of disability is nearly the same as that of a member of the general population. See Sachs Affidavit ¶ 20; Goodwin Affidavit ¶ 33. When viewed in the light most favorable to plaintiff, the evidence could support the proposition that MetLife's insurance practices were "unfair" under state law and therefore not protected by the safe-harbor provision of the ADA.

Depending on which party's evidence is credited, MetLife's decision to deny Doukas's application may or may not have been reasonably based on the relative risk of disability she posed.

19

Therefore, the court's review of the evidence leads to the conclusion that genuine issues of material fact exist precluding judgment as a matter of law for either party on the issue of whether MetLife's underwriting practices are based on or not inconsistent with state law under section 12201(c).

c. Subterfuge

Having passed the first hurdle of section 12201(c), the next issue concerns the last clause within section 12201(c)--whether the insurer's underwriting policies are a subterfuge to evade the purposes of Title III. To recapitulate, the safe-harbor provision states in pertinent part:

> **(c) Insurance**
> Subchapters I through III of this chapter and title IV of this Act shall not be construed to prohibit or restrict--
> (1) an insurer, hospital or medical service company, health maintenance organization, or any agent, or entity that administers benefit plans, or similar organizations from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law;
> . . . .
> Paragraph[] (1) . . . shall not be used as a subterfuge to evade the purposes of subchapter[s] I and III of this chapter.

42 U.S.C. § 12201(c). This court reads this provision to mean that even if the insurer's practices are based on or not inconsistent with state law, it can still violate the ADA if

20

plaintiff proves that it was a subterfuge to evade the purposes of the Act.

Defendant first argues that the term "subterfuge" cannot apply to practices in existence before the enactment of the ADA. However, the legislative history of this section clearly and unambiguously states that Congress intended that the date of adoption of a plan or practice would have no bearing on whether it is a subterfuge to evade the purposes of the ADA:

> [T]he decision to include this section may not be used to evade the protections of title I pertaining to employment, title II pertaining to public services, and title III pertaining to public accommodations beyond the terms of points (1), (2), and (3), <u>regardless of the date an insurance plan or employer benefit plan was adopted</u>.

H.R. Rep. No. 485(II), <u>supra</u>, at 136, *reprinted in* U.S.C.C.A.N., <u>supra</u>, at 419 (emphasis added); <u>accord</u> S. Rep. No. 116, <u>supra</u>, at 85; <u>Parker</u>, <u>supra</u>, 99 F.3d at ___, 1996 WL 613142 at *12. Under these circumstances, the court finds and rules that, notwithstanding that MetLife may have first instituted its underwriting guidelines prior to the enactment of the ADA, its subsequent practices in conformity with such guidelines could still qualify as a "subterfuge" within the meaning of the ADA. <u>See</u> <u>Parker</u>, <u>supra</u>, 99 F.3d at ___, 1996 WL 613142 at *12.

Defendant contends that the term "subterfuge" in the ADA safe-harbor provision should be interpreted in the manner in

21

which the Supreme Court has interpreted similar language within the Age Discrimination in Employment Act of 1965 (ADEA), 29 U.S.C. § 621, et seq. (1982 & Supp. V). See Public Employees Retirement Sys. of Ohio v. Betts, 492 U.S. 158 (1989) (reaffirming its earlier reasoning set forth in United Air Lines, Inc. v. McMann, 434 U.S. 192 (1977)). In Betts, the Supreme Court stated that "subterfuge" as used in the ADEA should be given its ordinary meaning as a "'scheme, plan, stratagem, or artifice of evasion.'" Betts, supra, 492 U.S. at 167 (quoting McMann, supra, 434 U.S. at 203). The Court reasoned that an employer who established a retirement plan prior to the enactment of the ADEA could not have acted with the intent to evade the purposes of the Act; therefore, plans predating the Act would not satisfy the subterfuge language of the Act. Id.

In Betts, the Court was unpersuaded by the legislative history submitted by the plaintiff because the committee reports were written after the relevant ADEA provision was passed and therefore provided little assistance in discerning the intent of the prior Congress. See id. at 168. In contrast, the plaintiff in the instant case has submitted committee reports of the actual Congress that passed the ADA; these documents are therefore a much stronger indicator of congressional intent than that which was before the Court in Betts. Moreover, as discussed above,

22

these documents plainly and unambiguously set forth that Congress, by its use of the term "subterfuge" did not intend to exempt pre-existing insurance plans. Accordingly, this case presents one of those perhaps rare situations when the legislative intent is so clearly and unmistakably expressed that it can overcome the customary meaning of the words within the statute. Cf. INS v. Cardoza-Fonseca, 480 U.S. 421, 432 n.12 (1987) (indicating that plain language of a statute could be overcome in face of a "clearly expressed legislative intention" to the contrary); accord State of Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 698 (1st Cir. 1994); Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc., 754 F.2d 404, 422 (1st Cir. 1985); 2A NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 46.01 (1992) ("even if the words of the statute are plain and unambiguous on their face the court may still look to the legislative history in construing the statute . . . if there is a clearly expressed legislative intention contrary to the language of the statute"). The court therefore rejects defendant's argument that because its underwriting guidelines had been promulgated prior to the enactment of the ADA, it is entitled to judgment as a matter of law on the subterfuge issue.

Defendant next contends that plaintiff has the burden of showing subterfuge and must produce evidence that MetLife devised

23

a "scheme or plan" intentionally designed to evade the purposes of the ADA. Plaintiff responds that Congress did not intend the term "subterfuge" to require a showing of conscious intent to discriminate.

An example mentioned in the Committee reports helps elucidate what Congress intended by the language "subterfuge" to evade the purposes of the ADA:

> For example, an employer could not deny a qualified applicant a job because the employer's current insurance plan does not cover the person's disability or because of the increased costs of the insurance.
> Moreover, while a plan which limits certain kinds of coverage based on classification of risk would be allowed under this section, the plan may not refuse to insure, or refuse to continue to insure, or limit the amount, extent, or kind of coverage available to an individual, or charge a different rate for the same coverage solely because of a physical or mental impairment, except where the refusal, limitation, or rate differential is based on sound actuarial principles or is related to actual or reasonably anticipated experience.

H.R. Rep., supra, at 136-37, *reprinted in*, 1990 U.S.C.C.A.N., supra, at 419-20. Although taken slightly out of context, the following language from the report is also helpful:

> In sum, [the safe-harbor provision] is intended to afford to insurers and employers the same opportunities they would enjoy in the absence of this legislation to design and administer insurance products and benefit plans in a manner that is consistent with basic principles of insurance risk classification. This legislation assures that decisions concerning the insurance of

24

> persons with disabilities which are not based on bona fide risk classification be made in conformity with non-discrimination requirements.

Id. at 137-38, *reprinted in* 1990 U.S.C.C.A.N., supra, at 420-21. Review of these sections leads the court to conclude that, while insurers retain the ability to follow practices consistent with insurance risk classification accepted under state law, these methods must still be based on sound actuarial principles or related to actual or reasonably anticipated experience. In the absence of such characteristics, an insurance practice that is otherwise not inconsistent with state law may still be a "subterfuge" to evade the purposes of the ADA and therefore unprotected by the safe-harbor provision. Moreover, these sections also do not indicate that plaintiff must show conscious intent on the part of the insurance company.

The court has found that a genuine issue of fact exists as to whether MetLife's decision was related to actual or reasonably anticipated experience. See discussion supra at 14-20. Therefore, MetLife is not entitled to judgment as a matter of law. Furthermore, the court's review of plaintiff's motion for summary judgment leads it to conclude that plaintiff is also not entitled to judgment as a matter of law.

## Conclusion

For the foregoing reasons, the court denies defendant's

25

motion for summary judgment as to Count I and grants said motion as to Count III (document 11).  It denies plaintiff's motion for summary judgment (document 19).

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

December 19, 1996
cc:  William D. Pandolph, Esq.
     Lee A. Perselay, Esq.
     Lynne J. Zygmont, Esq.