Boots v. Northwestern Mutual, et al   CV-98-625-JM 06/30/99    P

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**


<u>Robin E. Boots</u>


<u>_____v.</u>                              Civil No. 98-625-JM


<u>Northwestern Mutual Life
  Insurance Co.;</u>
<u>Disabilities Rights Center</u>


**O R D E R**


In this civil action brought pursuant to the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12000 (1994), plaintiff Robin Boots alleges that her former employer, the Disabilities Rights Center, Inc., and Northwestern Mutual Life Insurance Company discriminated against her by terminating the disability payments she was receiving through a Northwestern disability insurance plan provided through her employer. Boots contends that the plan, which provides lifetime benefits to the physically disabled, but provides only two years of benefits to the mentally disabled, violates the ADA. Currently before the court are defendant Northwestern's original motion to dismiss and its motion to dismiss the amended complaint. Plaintiff has objected to both motions.

## Background

Plaintiff was a staff attorney at the Disabilities Rights Center from 1990 until April 1996. As an employment benefit, she received long-term disability insurance issued and administered by defendant Northwestern. Under that policy, benefits for mental disabilities terminate after twenty-four months, while individuals disabled by a physical problem continue to receive benefits for as long as the disability persists, up until the individual reaches sixty-five years of age.

Plaintiff was hospitalized for depression on May 16, 1995. She was unable to return to work and applied for long-term disability benefits on August 22, 1995. Northwestern approved her application for benefits on November 14, 1995, finding that she became eligible on May 17, 1995. After receiving disability benefits for twenty-four consecutive months, plaintiff had not recovered from her disability, but her payments were terminated pursuant to the terms of the policy.

Plaintiff filed suit here on November 10, 1998, alleging that Northwestern violated Title III of the Americans with Disabilities Act. In response, Northwestern filed a motion to dismiss. Plaintiff then amended her complaint, adding her former employer, Disabilities Rights Center, as a defendant, and adding counts based on Title I of the ADA, which Northwestern has challenged by way of a second motion to dismiss.

<u>Discussion</u>

<u>1. Standard of Review</u>

When a court is presented with a motion to dismiss filed under Fed. R. Civ. P. 12(b)(6), "its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974). A motion to dismiss pursuant to Rule 12(b)(6) requires the court to review the complaint's allegations in the light most favorable to plaintiff, accepting all material allegations as true, with dismissal granted only if no set of facts entitles plaintiff to relief. <u>See, e.g.</u>, <u>Scheuer</u>, 416 U.S. at 236; <u>Berniger v. Meadow Green-Wildcat Corp.</u>, 945 F.2d 4, 6 (1st Cir. 1991); <u>Dartmouth Review v. Dartmouth College</u>, 889 F.2d 13, 16 (1st Cir. 1989).

<u>2. Title III of the ADA</u>

Plaintiff's complaint invokes Title III of the ADA, which establishes a prohibition against discrimination by public accommodations. Title III provides, in pertinent part, that

> [n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

3

Relying on cases decided by the United States Courts of Appeals for the Third and Sixth Circuits, defendant argues that an employee cannot use Title III to challenge an employer-provided benefit.  See Defendant's Motion to Dismiss with Memorandum of Law at 2 (citing Ford v. Schering-Plough, 145 F.3d 601, 614 (3d Cir. 1998), cert. denied, 119 S. Ct. 850 (1999); Parker v. Metropolitan Life Ins. Co., 121 F.3d 1006, 1014 (6th Cir. 1997), cert. denied, 118 S. Ct. 871 (1998)).  Beyond relying on these cases, the only reasoning Northwestern provides in support of its argument is that employees "cannot circumvent the requirements of Title I by proceeding under Title III."[1]  Defendant's Motion to Dismiss at 2.  Presumably, this argument is premised on the assumption that if alleged discrimination is covered by Title I, Title I is the exclusive remedy.  Courts holding that Title III does not govern insurers who provide employer-sponsored plans have done so on various grounds.  The Third and Sixth Circuit cases relied upon by Northwestern are

---

[1]Apparently Northwestern is alluding to the administrative exhaustion requirements applicable to Title I claims.  On the one hand, it could be argued that the administrative process is designed to apply specifically to employment situations for the purpose of encouraging cooperation and compromise between employers and employees.  On the other hand, it is equally plausible that the administrative exhaustion requirements of Title I were designed to discourage unfounded claims motivated by the greater remedies available under Title I.  As the facts must be developed further before a determination can be made of whether this claim falls within the purview of Title I, the court need not address the question at this juncture.

4

based on the premise that the public accommodations provisions of the ADA only govern access to physical structures. A related argument is that although the ADA prohibits denying access to services, it does not reach the content of goods or services provided. The court will address each of these arguments in turn.

First, the court finds that it need not decide at this juncture whether Title I and Title III are mutually exclusive. Northwestern's argument is based on the premise that Boots's claims against Northwestern are governed exclusively by Title I. It is far from clear, however, that these claims are governed by Title I. This is not a case in which a plaintiff is seeking to sue her employer under Title III for employment discrimination, without any allegation that the case involves the provision of goods or services, simply because the employer itself is a place of public accommodation. Cf. Motzkin v. Trustees of Boston University, 938 F. Supp. 983 (D. Mass. 1996). Title I prohibits a "covered entity" from discriminating on the basis of disability "in regard to . . . fringe benefits, available by virtue of employment, whether or not administered by the covered entity." 28 C.F.R. § 1630.4(f). "Covered entity" is defined under the ADA as "an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2). Although Northwestern could not be considered Boots's employer under the

common meaning of the word, the United States Court of Appeals for the First Circuit has held that an insurer can be considered an employer under Title I of the ADA under any of three different theories. See Carparts Distribution Ctr. v. Automotive Wholesaler's Ass'n of New England, Inc., 37 F.3d 12, 16 (1st Cir. 1994).

First, the Carparts court noted that an entity would be an "employer" under the ADA if it "exercised control over an important aspect of [the individual's] employment." Id. at 17.

> Relevant to this inquiry is whether defendant[] had the authority to determine the level of benefits that would be provided to . . . employees and whether alternative . . . plans were available to employees through their employment . . . . If defendant[] had the authority to determine the level of benefits, [it] would be acting as an employer who exercises control over this aspect of the employment relationship.

Id. On the other hand, the court noted that "insurance companies which merely sell a product to an employer but do not exercise control over the level of benefits provided to employees could not be deemed 'employers' under this rationale." Id. n.5.

Second, according to the First Circuit, an entity can be an "employer" if it is an agent of a covered entity. See id. at 17. Accordingly, an employer cannot insulate a discriminatory plan from attack simply by delegating its responsibility for employee benefits. See id.

6

Finally, the court noted that courts "have interpreted analogous provisions of Title VII [of the Civil Rights Act of 1964] to apply to actions taken by a defendant against a plaintiff who is not technically an employee of that employer." Id. at 18. The court gave as an example a case in which a court applied Title VII to "a hospital which refused to assign a private male nurse to female patients even though the nurse was technically not an employee of the hospital but was an employee of a particular patient." Id. (citing Sibley Memorial Hosp. v. Wilson, 488 F.2d 1338, 1341 (D.C. Cir. 1973)). Under this theory, an analogous Title I ADA case could be made out "when additional facts are developed." Id.

It is clear from Carparts that the facts need to be developed further before the court can determine whether the claim against Northwestern is covered by Title I. Accordingly, dismissal would not be appropriate, even assuming that the existence of a remedy under Title I precludes a Title III cause of action.

Defendant relies heavily on caselaw from other circuits dismissing similar claims on the ground that Title III applies only to physical structures. The problem with this strategy is that these cases are at odds with the law of the First Circuit. See Ford, 145 F.3d at 614 ("[W]e part company with the First Circuit in this regard."); Parker, 121 F.3d at 1013 ("We . . .

7

disagree with the First Circuit's decision in <u>Carparts</u> . . . ."). The courts in <u>Ford</u> and <u>Parker</u> concluded that the public accommodations provisions of the ADA apply only to physical places. <u>See Ford</u>, 145 F.3d at 614 ("we do not find the term 'public accommodation' . . . to refer to non-physical access"); <u>Parker</u>, 121 F.3d at 1010 ("a public accommodation is a physical place"). These cases do not stand for the proposition Northwestern advances--that an employee can sue an insurance company under Title I and that this is an exclusive remedy. <u>See</u> Defendant's Motion to Dismiss at 2 ("Plaintiff's claims under the ADA are governed exclusively by Title I."); <u>Ford</u>, 145 F.3d at 608, 612; <u>Parker</u>, 121 F.3d at 1014. Rather, these cases stand for the proposition that Title I is an employee's only avenue of recourse against her employer for alleged discrimination in the provision of benefits, and that an employee cannot sue the insurance company at all.

In <u>Carparts</u>, a case involving an employee's challenge to an employer-sponsored health insurance policy, the First Circuit explicitly held that Title III governs the provision of services irrespective of whether access to a physical place is at issue. <u>See Carparts</u>, 37 F.3d at 20. The <u>Carparts</u> court found the term "public accommodation" ambiguous and reasoned that it "would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who

8

purchase the same services over the telephone or by mail are not."  Id.  The court thus held that a provider of employer-sponsored insurance could be liable under Title III.

A related argument, advanced by the Seventh Circuit, is that "the content of the goods or services offered by a place of public accommodation is not regulated."  Doe v. Mutual of Omaha Ins. Co., __ F.3d__, 1999 WL 353014, at *2 (7th Cir. 1999).  In Doe, the Seventh Circuit held that although Title III's coverage was not limited to physical structures, it did not cover a health insurance policy that placed a $25,000 cap on benefits related to AIDS, but provided $1 million in benefits for other conditions.  See Doe, 1999 WL 353014, at *1.  According to the court, the insurance company did not violate the ADA because it did not refuse to sell insurance policies to people with AIDS.  See id.

This distinction between access and content, however, is not always clear.  See Carparts, 37 F.3d at 19 ("[T]here may be areas in which a sharp distinction between [access and products and services offered] is illusory.").  The Seventh Circuit cited Bragdon v. Abbott, 524 U.S. 624, 118 S. Ct. 2196 (1998), as an example of a case in which the ADA was violated by an outright refusal to serve a disabled person.  See Doe, 1999 WL 353014, at *1.  In Abbott, however, the dentist involved did not merely refuse to treat a patient with AIDS, he agreed to fill her tooth, but only if she would agree to have it done in the hospital

9

instead of his office and pay the hospital costs.  See Abbott,
118 S. Ct. at 2201.  Thus the plaintiff in Abbott was not refused
service entirely, but was offered a modified service at addi-
tional cost.  Similarly, as the Seventh Circuit itself acknowl-
edges, when an insurance plan caps benefits for one particular
condition such as AIDS, "the policies have less value to persons
with AIDS . . . ."  Doe, 1999 WL 353014, at *1.

Moreover, the distinction the Seventh Circuit draws between
access to insurance and the contents of the policy was rejected,
at least implicitly, by the First Circuit in Carparts.  Indeed,
Carparts involved precisely the same type of policy provision
as Doe--a cap on benefits for AIDS-related conditions in an
employer-provided health plan.  See Doe, 1999 WL 353014, at *1;
Carparts, 37 F.3d at 14.  The plain language of the ADA provides,
"It shall be discriminatory to provide an individual . . . on the
basis of a disability with a good [or] service . . . that is
different from that provided to other individuals, unless such
action is necessary to provide the individual with a good [or]
service . . . that is as effective as that provided to others."
42 U.S.C. § 12182(b)(1)(A)(iii).  "The language, 'with a good
[or] service . . . different . . . from that provided to other
individuals' logically extends not only to access to the good,
but to the nature of the good itself."  Doukas v. Metropolitan
Life Ins. Co., 950 F. Supp. 422, 426 (D.N.H. 1996).

In <u>Doukas</u>, this court (Devine, J.) considered whether a plaintiff who had been denied mortgage disability insurance because of her treatment for bipolar disorder could sue the insurance company under Title III of the ADA. <u>See id.</u> at 424. The court rejected the insurance company's argument that Title III does not apply to the substance of an insurance policy. The court found that applying Title III to the insurance company's denial of insurance was "consistent with the purpose of the statute, as articulated in <u>Carparts</u>." <u>Id.</u> at 426. The court also found support for this interpretation in the Department of Justice's analysis of Title III. <u>See id.</u> (citing 28 C.F.R. pt. 36, subpart B). "The DOJ interprets Title III as prohibiting 'differential treatment of individuals with disabilities in insurance offered by public accommodations unless the differences are justified.'" <u>Id.</u> at 427 (quoting 28 C.F.R. pt. 36, subpart B., § 36.212).

Accordingly, the court finds that plaintiff's claim can proceed under Title III of the ADA.

## 3. Discrimination Between Disabilities

Northwestern next argues that regardless of whether Boots's claim is made pursuant to Title I or Title III, it fails to state a claim under the ADA because the Act does not cover discrimination between different disabilities. Although there is authority

to support this argument, for the reasons stated below, the court finds this argument unpersuasive.

Title III provides that "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods [and] services . . . of any place of public accommodation . . . ."  42 U.S.C. § 12182(a).  Title I provides that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  These prohibitions are similar to those found in Title VII of the Civil Rights Act of 1964.  See 42 U.S.C. §§ 2000a, 2000e-2.  "In parsing the ADA . . . [courts] draw freely on precedents in other types of discrimination cases."  Dichner v. Liberty Travel, 141 F.3d 24, 29-30 n.5 (1st Cir. 1998); see EEOC v. Amego, Inc., 110 F.3d 135, 145 n. 7 (1st Cir. 1997) (stating that "the ADA is interpreted in a manner similar to Title VII").  In employment discrimination cases under Title VII, courts have held that an adverse action is discriminatory when the employee would have been treated differently but for the employee's race, religion, or gender.  See Oncale v. Sundowner Offshore Servs. Inc., 118 S. Ct. 998, 1002 (1998); Newport News Shipbuilding & Dry Dock v. EEOC, 462 U.S. 669, 683 (1983); Pettiti v. New England Telephone & Telegraph Co., 909 F.2d 28, 33 (1st Cir. 1990).  Of course, the elements of

**12**

a claim under Title I of the ADA differ from the elements of a Title III claim. Nevertheless, Northwestern's argument does not distinguish between Title I and Title III for the purposes of this argument. Accordingly, the court assumes that its argument is solely based on the premise that distinguishing between disabilities does not amount to discrimination.[2]

Northwestern relies on opinions from various circuits, which it states "correctly held that the ADA does not require that a benefit or advantage provided to one category of disabled persons must be provided to all." Defendant's Motion to Dismiss at 4 (citing Ford, 145 F.3d at 608; Parker, 121 F.3d at 1015-19; EEOC v. CNA Ins. Co., 96 F.3d 1039, 1044 (7th Cir. 1996); Modderno v. King, 82 F.3d 1059, 1061-63 (D.C. Cir. 1996), cert. denied, 519 U.S. 1094 (1997)).

---

[2]One of the cases Northwestern cited, EEOC v. CNA Ins. Co., 96 F.3d 1039 (7th Cir. 1996), held that a former employee cannot challenge a disability benefits plan because a completely disabled former employee is not a "qualified individual with a disability." In CNA, the court noted that no discrimination had occurred while the plaintiff was an employee because her employer did not charge higher prices to disabled people or vary the terms of its plan for disabled employees. See id. at 1044. In this case, Northwestern has not advanced this argument. Rather than arguing that Boots cannot sue under Title I because she is not a qualified individual, Northwestern has argued that Title I is her exclusive remedy.

Most of these cases relied on two Rehabilitation Act cases decided by the United States Supreme Court.[3] See, e.g., Ford, 145 F.3d at 608 (citing Alexander v. Choate, 469 U.S. 287 (1985); Traynor v. Turnage, 485 U.S. 535 (1988)); Parker, 121 F.3d at 1016-17 (same). Although these cases contain some general language that could be construed to support defendant's proposition, these cases are clearly not controlling, as they are readily distinguishable from the instant case.

In Alexander, the Court considered a challenge to Tennessee's proposal to reduce the annual number of days of inpatient hospital care covered by its state Medicaid program. See Alexander, 469 U.S. at 289. Unlike this case, which involves an allegation of disparate treatment, plaintiffs in Alexander argued that the across-the-board limit on hospital coverage would have a disparate impact on the handicapped. See id. at 292. Accordingly, the Court's opinion in Alexander focused on the question of whether the Rehabilitation Act prohibits only intentional discrimination or also covers neutral policies that have a disparate impact on the disabled.[4] See id. The Court "assumed

_____

[3]Congress explicitly provided that the ADA, which employs similar language, should be interpreted consistently with the earlier Rehabilitation Act.

[4]Although the Rehabilitation Act and the ADA are similar in many ways, the Rehabilitation Act is a spending clause statute. Accordingly, the question of whether it covers disparate impacts raises unique issues.

**14**

without deciding that [the Rehabilitation Act] § 504 reaches at least some conduct that has a disparate impact upon the handicapped." Id. at 299. The Court, however, went on to hold that the limitation did not violate the Rehabilitation Act because it did not deny the plaintiffs meaningful access to Medicaid service. See id. at 302. In reaching this conclusion, the Court noted that "the reduction, neutral on its face, does not distinguish between those whose coverage will be reduced and those whose coverage will not on the basis of any test, judgment, or trait that the handicapped as a class are less capable of meeting or less likely of having." Id. The limit also did "not apply to only particular handicapped conditions and [took] effect regardless of the particular cause of hospitalization." Id. at n.22. The Court rejected the contention that "Tennessee must single out the handicapped for more than 14 days of coverage," noting that the Medicaid Act does not provide a guarantee of "'adequate health care.'" Id. at 302-03.

Traynor involved a challenge to Veterans' Administration decisions denying two recovered alcoholics extensions of the time allotted to take advantage of their veterans' educational benefits. See Traynor, 485 U.S. at 537. The governing act entitled honorably discharged veterans to receive educational assistance benefits within ten years after their discharge. See id. at 538. Veterans prevented from using their benefits within ten years by

"'a physical or mental disability which was not the result of [their] own willful misconduct,'" could obtain an extension of the time limit.[5]  Id. (quoting the Veterans' Readjustment Benefit Act of 1966, 38 U.S.C. § 1662(a)(1)).  The Veterans' Administration "construed the term 'willful misconduct' . . . as encompassing primary alcoholism (i.e., alcoholism that is not 'secondary to and a manifestation of an acquired psychiatric disorder')."  Id. at 545.

In holding that the Veterans' Administration policy did not violate the Rehabilitation Act, the Court noted that the plaintiffs were not "denied benefits 'solely by reason of [their] handicap,' but because they engaged with some degree of willfulness in the conduct that caused them to become disabled."  Id. at 549-50.  Thus it is clear that the Court's statement, quoted in Parker and Ford, that "[t]here is nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of

_____

[5]In adopting the relevant provision, "Congress intended that the Veterans' Administration apply [its longstanding] test of 'willful misconduct,'" which defined primary alcoholism as "willful misconduct."  Traynor, 485 U.S. at 546.  Accordingly, plaintiff's claim could only succeed if the later Rehabilitation Act was deemed to implicitly overrule the "willful misconduct" provision.  This would require the plaintiffs to "overcome the '"cardinal rule . . . that repeals by implication are not favored."'"  Id. at 547 (quoting Morton v. Mancari, 417 U.S. 535, 549-50 (1974) (quoting Posadas v. National City Bank, 296 U.S. 497, 503 (1936))).

handicapped persons," <u>Traynor</u>, 485 U.S. at 549, simply means that a distinction between disabilities for which an individual bears some responsibility and other disabilities is not a distinction based on disability. <u>See</u> <u>Ford</u>, 145 F.3d at 609; <u>Parker</u>, 121 F.3d at 1016 (quoting <u>Traynor</u>, 485 U.S. at 549). The <u>Traynor</u> Court noted that if primary alcoholism was "not always 'willful,' . . . some veterans denied benefits may well be excluded solely on the basis of their disability." <u>Traynor</u>, 485 U.S. at 550. The Court, however, declined to disturb Congress's and the Veterans' Administration's determinations that primary alcoholism is willful. <u>See</u> <u>id.</u> at 550-51.

Moreover, the Supreme Court has just rejected the argument that disparate treatment of different members of a protected class is not discrimination. <u>See</u> <u>Olmstead v. L.C.</u>, __ U.S. __, 1999 WL 407380, at *9 n.10 (1999). In <u>Olmstead</u>, an ADA case challenging a state's practice of placing persons with mental disabilities who could be treated in less restrictive settings in institutions, the dissent argued that "this Court has never endorsed an interpretation of the term 'discrimination' that encompassed disparate treatment among members of the same protected class." <u>Id.</u> at *19 (Thomas, J., dissenting). The majority rejected this argument as "incorrect as a matter of precedent and logic." <u>Id.</u> at *9 n.10 (citing <u>O'Connor v. Consolidated Coin Caterers Corp.</u>, 517 U.S. 308, 312 (1996)).

Indeed, it is well established that federal statutes prohibiting discrimination are violated when adverse action is taken against an individual on the basis of the protected trait.[6]  Blacks and Hispanics are protected against discrimination based on race or national origin by Title VII; forty-five-year-olds and sixty-five-year-olds are protected against discrimination based on age

---

[6]The question of whether an individual in the protected class lost out to another in the protected class is most relevant when the plaintiff is using the McDonnell Douglas burden-shifting model to establish a prima facie case.  In the absence of direct evidence of discriminatory animus, a plaintiff can establish an inference of discrimination by showing "'(i) that he belongs to [the protected class]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer con-tinued to seek applicants from persons of [the] complainant's qualifications.'"  O'Connor, 517 U.S. at 310 (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  The United States Supreme Court recently considered whether in ADEA cases a plaintiff using this burden-shifting model must show that he or she was passed over in favor of someone under forty.  The Court held that the plaintiff did not.  The Court stated that "[t]he fact that one person in the protected class has lost out to another person in the protected class is . . irrelevant, so long as he has lost out because of his age."  Id. at 312.  When an individual in the protected class is passed over or replaced with someone not in the protected class it usually supports the infer-ence that the decision was discriminatory.  The distinction between members and non-members of the protected class, however, is not dispositive.  What the McDonnell Douglas prima facie case requires is "'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion . . . .'"  O'Connor, 517 U.S. at 312 (quoting Teamsters v. United States, 431 U.S. 324, 358 (1977)).  In cases where there is direct evidence of discrimination, however, "the McDonnell Douglas framework is inapposite.  In those cases, direct evidence of discriminatory motive . . . serves to shift the burden of persuasion . . . ."  Smith v. F.W. Morse & Co., 76 F.3d 412, 421 (1st Cir. 1996).

by the ADEA; and schizophrenics and persons confined to wheel-chairs are protected against discrimination based on disability by the ADA.  Title VII clearly is violated by a policy that discriminates against Hispanics but favors blacks; the ADEA is violated by hiring a forty-five-year-old over an otherwise quali-fied sixty-five-year-old based on age.  See O'Connor, 517 U.S. at 312.  It logically follows that the ADA is violated by a policy that disadvantages schizophrenics based on their disability, despite the fact that individuals confined to wheelchairs are benefitted.[7]

Some courts have held that "'by reason of her or his disability' . . . means by reason of one of the things described in [the statutory definitions of disability.]"  Modderno, 82 F.3d at 1061.  This view was clearly abjured by the Supreme Court in School Bd. of Nassau County v. Arline, 480 U.S. 273 (1987).  In Arline, the Court rejected the defendant's attempt to distinguish

---

[7]In Modderno v. King, the court argued that because Alexander stands for the proposition that benefits can be limited across the board, "[the Rehabilitation Act] cannot forbid partial limits that leave some disabled individuals better off and the remainder no worse off."  Modderno, 82 F.3d at 1062.  This reasoning flies in the face of the central purpose of anti-discrimination statutes--to assure that each individual is judged by his or her abilities, not on the basis of stereotypes.  The point of such statutes is to eliminate classifications based on irrelevant criteria.  Certainly no one would suggest that because an employer is not required to provide a certain benefit, Title VII would allow it to provide that benefit only to Asian employees and not to black or white employees.

between the contagious effects of a disease and the physical impairment produced by the disease.[8]  The employer in that case, who had terminated an employee with tuberculosis, argued that it discriminated against her because it feared her condition was contagious, not because of her physical impairment.  According to the Court, "Allowing discrimination based on the contagious effects of a physical impairment would be inconsistent with the basic purpose of [the Rehabilitation Act], which is to ensure that handicapped individuals are not denied jobs or other bene-

-----

[8]Although the employer could exclude an employee who posed a direct threat to the safety of others, the Court noted that the law was "structured to replace . . . reflexive reactions to actual or perceived handicaps with actions based on reasoned and medically sound judgments . . . ."  Arline, 480 U.S. at 285.

> The fact that some persons who have contagious diseases may pose a serious health threat to others under certain circumstances does not justify excluding from the coverage of the Act all persons with actual or perceived contagious diseases.  Such exclusion would mean that those accused of being contagious . . . would be vulnerable to discrimination on the basis of mythology --precisely the type of injury Congress sought to prevent."

Id.

Similarly, in the context of insurance, the so-called safe-harbor provision of the ADA allows an insurer to avoid liability so long as its decision is consistent with state law and not a subterfuge  to evade the purposes of the ADA.  See 42 U.S.C. § 12201(c).  To do this, the insurer must show that its practices are consistent with insurance risk classification "based on sound actuarial principles or related to actual or reasonably antici-pated experience."  Doukas, 950 F. Supp. at 431.

fits because of the prejudiced attitudes or the ignorance of others."  Id. at 284.

Cases finding that a disparity in benefits between mental and physical disabilities does not violate the ADA have also cited the ADA's legislative history for support.  See Ford, 145 F.3d at 610 (quoting S. Rep. No. 101-116, at 29 (1989)).  In particular, the Ford court relied on the following language,

> [W]hile it is permissible for an employer to offer insurance policies that limit coverage for certain procedures or treatments, e.g., only a specified amount per year for mental health coverage, a person who has a mental health condition may not be denied coverage for other conditions such as for a broken leg or for heart surgery because of the existence of the mental health condition.  A limitation may be placed on reimbursements for a procedure or the types of drugs or procedures covered[,] e.g., a limit on the number of x-rays or non-coverage of experimental drugs or procedures; but, that limitation must apply to persons with or without disabilities.

Id. (quoting S. Rep. No. 101-116, at 29 (1989)) (emphasis added).  This language, however, makes clear that Congress was referring to limitations on particular treatments or procedures, not singling out particular disabilities for different coverage.  This interpretation of the legislative history is consistent with House and Senate reports explaining the safe-harbor provision.  For instance, the House report states,

> Under the [Disabilities Act], a person with a disability cannot be denied insurance or be subject to different terms or conditions of

**21**

> insurance based on disability alone, if the
> disability does not impose increased risks.
>   . . . .
>   Moreover, while a plan which limits certain
> kinds of coverage based on classification of risk
> would be allowed under this section [codified at
> 42 U.S.C. § 12201(c)], the plan may not refuse to
> insure, or refuse to continue to insure, or limit
> the amount, extent, or kind of coverage available
> to an individual, or charge a different rate for
> the same coverage solely because of a physical or
> mental impairment . . . .

Parker, 121 F.3d at 1020-21 (Merritt, J., dissenting) (quoting

H.R. Rep. No. 101-485, at 136-37 (1990), reprinted in 1990

U.S.C.C.A.N. 267, 303, 419-20).

The final argument relied upon by Northwestern and the cases

it cited is that the enactment of the Mental Health Parity Act of

1996, 42 U.S.C. § 300gg-5, supports the conclusion that the ADA

does not cover the plan provision at issue in this case. See

Defendant's Motion to Dismiss at 5 (citing Ford, 145 F.3d at 610;

Parker, 121 F.3d at 1018 n.16; CNA Ins., 96 F.3d at 1044). This

argument lacks merit. The Mental Health Parity Act requires

group health benefit plans that provide medical, surgical, and

mental health benefits to provide coverage for psychological

treatment equal to that provided for physical care. See 42

U.S.C. § 300gg-5. Defendant suggests that "[t]he 1996 Act would

have been unnecessary if the ADA, which applies to all terms,

benefits and privileges of employment, prohibited such differen-

tiation." Defendant's Motion to Dismiss at 5. What the ADA

**22**

prohibits is discriminating against an individual based on dis-ability.  Just as most employees who use their health insurance to cover medical costs are not physically disabled, most employees seeking insurance coverage for mental health treatment are not mentally disabled.  Thus the 1996 Act does not cover the same ground at all.


## Conclusion

For the abovementioned reasons, Defendant's Motion to Dismiss and Defendant's Motion to Dismiss the Amended Complaint are denied.

SO ORDERED.


_____
James R. Muirhead
United States Magistrate Judge

June 30, 1999

cc:  Byrne J. Decker, Esq.
     Thomas B. Merritt, Esq.
     Mark T. Broth, Esq.